UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| GAGIK MELKUMYAN, | : | | |
| | : | | |
| *Plaintiff*, | : | Civil Action No.: | 21-2700 (RC) |
| | : | | |
| v. | : | Re Document No.: | 5, 8 |
| | : | | |
| SAMANTHA POWER, ADMINISTRATOR OF USAID, | : | | |
| | : | | |
| *Defendant*. | : | | |

### MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT; DENYING AS MOOT DEFENDANT'S MOTION TO DISMISS ORIGINAL COMPLAINT**

### I. INTRODUCTION

Plaintiff Gagik Melkumyan served as a Regional Controller for three Missions of the U.S. Agency for International Development ("USAID"): in Georgia, Armenia, and Azerbaijan. However, in 2017, the Mission Director for Azerbaijan requested that he not provide support for the Mission in that country, for the sole and explicit reason that Melkumyan is of Armenian origin. Over the next three and a half years, Melkumyan was denied the ability to perform his job duties related to the Azerbaijan Mission. He did not file an administrative complaint, however, until he was denied a promotion in February 2021, which he claims occurred because his inability to cover his full portfolio damaged his promotion application. For the reasons explained below, the Court will allow Melkumyan's claim to proceed, with some limitations.

### II. FACTUAL BACKGROUND

During the relevant time period, Melkumyan worked as a Foreign Service Officer for USAID based in Tbilisi, Georgia. Am. Compl. ¶ 6, ECF No. 7. USAID supports the United States' foreign policy through development and humanitarian assistance programs in over 100

countries worldwide.  *See Who We Are*, USAID, https://www.usaid.gov/who-we-are.[1] Melkumyan's position of Regional Controller involved "financial management and fiduciary oversight of taxpayer-funded programs" in three countries: Georgia, Armenia, and Azerbaijan. Am. Compl. ¶ 7.  Part of his duties required travel to the Missions in those countries.  *Id.*

In November 2017, the Mission Director for USAID in Azerbaijan, Mikaela Meredith, met Melkumyan when she was in Tbilisi and learned that his national origin was Armenian.  *Id.* ¶¶ 9–10.  There is a long-running conflict between Azerbaijan and Armenia that is a major source of instability in the region.  *See Azerbaijan*, CIA World Factbook, https://www.cia.gov/the-world-factbook/countries/azerbaijan/#introduction (last updated July 13, 2022).  Meredith requested that Melkumyan's supervisor eliminate Melkumyan's official duties for USAID in Azerbaijan, specifically giving Melkumyan's Armenian national origin as the reason.  Am. Compl. ¶¶ 12–13.

Melkumyan expressed his concern to management and subsequent supervisors about having a third of his duties removed but was nonetheless not permitted to work on issues concerning Azerbaijan over the next three and a half years.  *Id.* ¶¶ 14–18.  Also during that time frame, Melkumyan unsuccessfully attempted to receive a diplomatic visa permitting him to travel to Azerbaijan for essential job tasks.  *Id.* ¶ 20.  He alleges that upper-level management at USAID did not assist him with obtaining that visa.  *Id.* ¶¶ 19–21.

Melkumyan nonetheless excelled in his responsibilities over the remaining two countries in his portfolio, Georgia and Armenia.  *Id.* ¶ 24.  As a result, he was recommended for a

---

[1] The Court may take judicial notice of information posted on the official public websites of government agencies at the motion to dismiss stage.  *See Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." (citations omitted)).

promotion in the 2020 and 2021 evaluation cycles. *Id.* In February 2021, Melkumyan was denied a promotion, allegedly because he was ranked against peers who had been able to perform the full portfolio of their duties. *Id.* ¶ 26. Melkumyan then filed a charge with USAID's Office of Civil Rights and Diversity alleging discrimination on the basis of his national origin going back to 2017. *Id.* ¶¶ 31–32. The agency released a Report of Investigation in September 2021, and final action had not yet been taken when the action was filed in this Court. *Id.* ¶¶ 33–34.

### III.  LEGAL STANDARD

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because subject matter jurisdiction focuses on the court's power to even hear the claim, a court is to apply closer scrutiny when resolving a Rule 12(b)(1) motion compared to a Rule 12(b)(6) motion for failure to state a claim. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

In contrast, a motion to dismiss under Rule 12(b)(6) does not test a plaintiff's likelihood of success on the merits, but rather "tests the legal sufficiency of a complaint" by asking whether the plaintiff has properly stated a claim for which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The complaint must be construed "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. *Id.* A court need not accept a plaintiff's legal conclusions as true, *id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *Twombly*, 550 U.S. at 555. "In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (citation omitted).

## IV. ANALYSIS

The parties characterize the series of events in the amended complaint very differently. The Government describes it as three discrete events—the failure of the agency to assist Melkumyan in obtaining a visa to Azerbaijan, the reassignment of his duties of Azerbaijan, and the denial of his promotion. Def.'s Mot. Dismiss or in Alt. Summ. J. ("Mot. Dismiss") at 4–5, ECF No. 8-1.[2] According to the Government, any failure to assist with the visa is unreviewable under the political question doctrine, any claim regarding portfolio reassignment is time-barred and not an adverse action, and the denial of the promotion was not based on Melkumyan's national origin by his own admission. *Id.* In contrast, Melkumyan claims that his exclusion from one-third of his duties was part of an ongoing pattern of discrimination that culminated in,

---

[2] The Government's first motion to dismiss was filed on December 27, 2021. *See* Mot. Dismiss, ECF No. 5. Rather than responding, Melkumyan filed an amended complaint as of right within 21 days of that motion. *See* Am. Compl.; Fed. R. Civ. P. 15(a)(1)(B). Because the amended complaint supersedes the original complaint and a new motion to dismiss pertaining to the operative amended complaint has been filed, the Court denies the original motion to dismiss as moot. *See Adams v. Quattlebaum*, 219 F.R.D. 195, 197 (D.D.C. 2004) (denying a motion to dismiss that "pertain[ed] to the original and now-superseded complaint"); *Bancoult v. McNamara*, 214 F.R.D. 5, 13 (D.D.C. 2003) (same).

and only became actionable with, the denial of the promotion. Opp'n to Mot. Dismiss Alt. Summ. J. ("Opp'n") at 1, 7–8, n.3, ECF No. 9.

As Melkumyan clarifies, the allegations in the amended complaint relating to the denial of Melkumyan's visa by the government of Azerbaijan and USAID's failure to invoke 22 U.S.C. § 2426(b), which prohibits the use of economic development funds "to any country which objects to the presence of any officer or employee of the United States who is present in such country for the purpose of carrying out any program of economic development assistance . . . on the basis of the race, religion, national origin, or sex of such officer or employee," are provided only as "background and context" for the discriminatory actions that his own supervisors and colleagues took. *See* 22 U.S.C. § 2426(b) (cited in Opp'n at 7). Accordingly, the Court fortunately has no need to delve into the "murky and unsettled" political question doctrine. *See Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008) (quoting *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J., concurring)).

With respect to the remaining events, the Court agrees with the Government that Melkumyan fails to state a claim for a hostile work environment or a continuing violation. The Court will, however, allow Melkumyan's discriminatory non-promotion claim to proceed.

### A. The Reduction of Duties

Melkumyan's difficulties began when he was relieved of responsibility over a third of his assigned portfolio that corresponded to the USAID Mission in Azerbaijan because of his Armenian national origin. Am. Compl. ¶¶ 11–13. The Government argues that Melkumyan failed to timely exhaust administrative remedies with respect to this action.[3] Specifically, the

---

[3] "A motion to dismiss on the ground that a plaintiff failed to exhaust her administrative remedies properly is analyzed under Rule 12(b)(6)." *Jones v. Bush*, 160 F. Supp. 3d 325, 337

reduction of Melkumyan's duties over the Azerbaijan Mission occurred in November 2017, and Melkumyan did not initiate contact with an agency counselor until February 2021—well after the 45-day time period required by regulation. *See* Mot. Dismiss at 11 (citing 29 C.F.R. § 1614.105(a)(1)). Melkumyan instead counters that the reduction of his duties was a continuing violation that created a hostile work environment and culminated in the denial of a promotion in February 2021. Opp'n at 13.

When determining whether administrative exhaustion was timely, courts generally begin by "analyz[ing the] Plaintiff's claims to determine whether they fall into the category of discrete or ongoing discriminatory acts." *Gordon v. Napolitano*, 786 F. Supp. 2d 82, 84 (D.D.C. 2011). Discrete acts "such as termination, failure to promote, denial of transfer, or refusal to hire" must be exhausted within the applicable statutory period, whereas hostile work environment claims are actionable if any of the alleged hostile actions occurred within the limitations period because "[s]uch claims are based on the cumulative effect of individual acts" and therefore "cannot be said to occur on any particular day." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–115 (2002).

The reduction of Melkumyan's duties was a discrete act. It occurred on a single day—November 9, 2017, to be exact—when Melkumyan's supervisor made the decision to remove the portions of his portfolio relating to Azerbaijan. *See* Am. Compl. ¶¶ 9, 12–13. Melkumyan was immediately aware of the reassignment of his duties and the reason for it. *Id.* Although the decision was subsequently adhered to, and therefore had continuing effects over a longer period of time, the same can also be said of classically discrete actions such as the "failure to promote"

---

(D.D.C. 2016) (citation omitted), *aff'd*, No. 16-cv-5103, 2017 WL 2332595 (D.C. Cir. Feb. 21, 2017).

6

or "denial of transfer." *See Morgan*¸ 536 U.S. at 114; *see also Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012) (determining that *Morgan* forecloses untimely failure-to-promote claims even if they result from an ongoing policy).

Perhaps recognizing this flaw, Melkumyan argues that his claim only ripened when "the consequences of the reduction of his duties manifested in his denial of promotion." Opp'n at 1; *see also id.* at 18 ("[W]ithout an adverse employment action, [Melkumyan] was compelled to wait until after he learned that he was not promoted to initiate his EEO charge.").[4] But just a connection to present consequences is not enough to resurrect time-barred discrete actions. *See Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997) (holding that an untimely suit "cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier" (citations omitted)).

*Taylor v. FDIC* addressed an allegedly retaliatory reassignment to an undesirable unit prior to the limitations period. *Id.* at 765. There, the D.C. Circuit rejected the plaintiffs' argument that the continuation of "their grim working conditions" within the limitations period

---

[4] The Court need not address the Government's alternative argument that merely reassigning duties is not an adverse action, *see* Mot. Dismiss at 13, although it is skeptical that the removal of one-third of Melkumyan's job duties can be fairly considered a mere "reassignment," particularly where those duties were not replaced with other responsibilities and did not result from an increase in the overall workforce or a department-wide reorganization. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) (determining that no adverse action had occurred where the reduction of the plaintiff's duties was the result of the agency expanding its staffing levels to full force after a budget freeze); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (concluding that a factfinder could determine an adverse action had occurred where the plaintiff "experience[d] an extraordinary reduction in responsibilities" over two years in which she "was performing tasks commensurate with . . . six grades below [her] position" despite not suffering "a reduction in grade, pay, or benefits"). The Court also notes that the Government's alternative argument has been further weakened by the recent *en banc* decision in *Chambers v. District of Columbia*, which determined that a discriminatory lateral transfer, or the discriminatory denial thereof, affects the "terms, conditions, or privileges of employment" within the meaning of Title VII regardless of whether it causes an "objectively tangible harm." 35 F.4th 870, 872–73 (D.C. Cir. 2022) (en banc).

7

was an actionable continuing violation because their "banishment . . . amply manifested itself as a possible retaliation from the start." *Id.* As the court explained, "a continuing violation is 'one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period . . . .'" *Id.* (citations omitted); *see also Schrader v. Tomlinson*, 311 F. Supp. 2d 21, 27 (D.D.C. 2004) ("[A] plaintiff may not rely on the continuing violation theory where she was aware of the discriminatory conduct at the time it occurred."). Here, construing all allegations in the complaint as true, the removal of Melkumyan's duties was immediately identifiable as a discrete discriminatory action. And it is axiomatic that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

Melkumyan does not respond to the Government's discussion of *Taylor v. FDIC* at all, instead pivoting in his opposition brief to follow the well-worn path laid out in *Morgan* by arguing that Meredith's decision to exclude him from his duties relating to the Azerbaijan Mission—and the agency's ongoing adherence to that decision—created a hostile work environment. Opp'n at 13. "The *Morgan* principle is not, however, an open sesame to recovery for time-barred violations. Both incidents barred by the statute of limitations and ones not barred can qualify as 'part of the same actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment claim . . . ." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (quoting *Morgan*, 536 U.S. at 120–21)). But the Government is correct that Melkumyan has failed to state a claim for a hostile work environment.

"To prevail on a hostile work environment claim, a plaintiff must first show that he or she was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Courts evaluate whether a hostile work environment exists by looking to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morgan*, 536 U.S. at 116. The environment must be both "objectively hostile or abusive" and "subjectively . . . abusive." *Harris*, 510 U.S. at 21–22; *see also Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018). "The key terms . . . are 'severe,' 'pervasive,' *and 'abusive,'* as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 93 (D.D.C. 2009) (emphasis added).

      First, it does not appear that Melkumyan exhausted a hostile work environment claim. To be sure, courts do not require a plaintiff to raise that claim by name or to use specific "magic words" in order to exhaust it. *See Congress v. District of Columbia*, 324 F. Supp. 3d 164, 171 (D.D.C. 2018); *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 348 (D.D.C. 2013). But there must be enough of a suggestion of such a charge that the agency would be on notice and able to investigate it. *See Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) ("A vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims it does not fairly embrace . . . [because this] would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." (internal quotation marks and citations omitted)). In the Affidavit of the Complaint,

attached to the first motion to dismiss,[5] Melkumyan does not include any facts that would tend to show hostility in his working environment. The administrative complaint was not submitted by either party, but Melkumyan's only allegation in that respect is that he "alleged a continuing violation, and identified facts dating back to 2017 when Meredith originally discriminated against him." Am. Compl. ¶ 32. It says nothing about raising a hostile work environment to the agency's attention.

What's more, the Amended Complaint filed in this Court does not state a claim for a hostile work environment. *See Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012) (rejecting a plaintiff's attempt to add a hostile work environment claim in an opposition brief even though the complaint included words like "harass[]," "abusive," "humiliat[ing]," and "embarrass[ing]" (internal citation omitted)). Like the plaintiff in *Taylor v. Mills*, Melkumyan included only one count (discrimination on the basis of national origin) and did not include a separate hostile environment claim. *See id.* And unlike the plaintiff in *Taylor v. Mills*, Melkumyan did not even allege that any of the actions were hostile, abusive, or any such similar adjectives. *Id.*; *see also Reshard v. LaHood*, 443 F. App'x 568, 570 (D.C. Cir. 2011) (rejecting a plaintiff's attempt to resurrect a hostile work environment claim even though it likely had been exhausted in the administrative level because it was not raised or litigated until appeal); *Rospendowski v. Columbia Cnty. Sheriff*, No. 4:16-cv-00526, 2020 WL 5602967, at *3 (M.D. Pa. Sept. 18, 2020) ("[I]n the absence of a claim specifically pleading a hostile work environment, it

---

[5] In employment discrimination cases, "courts may typically refer to administrative records of Equal Employment Opportunity complaints, investigations, and adjudications for the limited purpose of determining whether Plaintiff exhausted administrative remedies before suing without converting the Motion to Dismiss into a Motion for Summary Judgment . . . ." *Roberts v. Scalia*, 1:19-cv-00474, 2020 WL 1892057, at *3 n.2 (D.D.C. Apr. 16, 2020).

is not appropriate to infer the existence of a hostile work environment claim from the averment of facts in support of a disparate treatment claim.").

Melkumyan's argument centers entirely on his allegations that the exclusion from any duties related to Azerbaijan was ongoing and pervasive. Opp'n at 14, 16–17. But not all ongoing conduct is necessarily hostile. The Court draws the inference in favor of Melkumyan (as it must at this stage) that his exclusion from duties related to Azerbaijan was subjectively offensive. But even so, none of his factual allegations allow the Court to infer that the alleged acts rose to the kind of "extreme" objective conditions that constitute a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Being excluded from certain tasks and told to "stand down," *see* Am. Compl ¶¶ 17–18, falls well short of the "discriminatory intimidation, ridicule, and insult" "creat[ing] an abusive working environment" that is required for a hostile work environment claim, *Harris*, 510 U.S. at 21 (citations omitted). Nor does the denial of the promotion raise the claim to the level of a cohesive hostile environment, even when considered alongside the reduction in responsibility. *See Whorton*, 924 F. Supp. 2d at 354 (collecting cases in which denials of training and non-selection were insufficient to state a claim for a hostile work environment); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 220–21 (D.D.C. 2013) (dismissing a hostile work environment claim as insufficiently severe even though the "defendant's actions made [plaintiff's] job more difficult[,] . . . hurt her reputation and undermined her leadership" and even though plaintiff argued that "serving as [supervisor] of the same division for more than seven years while nearly all of one's peers are promoted can be 'objectively and subjectively humiliating'"); *Nurriddin*, 674 F. Supp. 2d at 94 (dismissing hostile work environment claim alleging opposition to career advancement, close scrutiny of assignments, removal of important assignments, denial of transfer, lowered

performance evaluations, and "fail[ure] to provide support for his work with staffing and funding").

In sum, Melkumyan's claim of national origin discrimination based on the removal of his responsibilities for the Azerbaijan Mission is untimely, and he cannot belatedly save it by shoehorning it into a hostile work environment claim that he did not plead. *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)). Accordingly, the Court will grant the Government's Motion to Dismiss with respect to the claim related to the removal of those duties.

### B. The Failure to Promote

That leaves the final alleged event, the denial of a promotion to the FS-02 level in February 2021. Am. Compl. ¶ 25. The Government does not dispute that this claim was administratively exhausted within the applicable time limit, but it argues that Melkumyan has conceded a lack of discriminatory intent on the part of the Promotion Board. Mot. Dismiss at 14.[6] Melkumyan counters that his eligibility for the promotion was "hampered" by the preceding discrimination and was a direct cause of it. Am. Compl. ¶ 27; Opp'n at 19.

---

[6] The Government asks the Court to convert the motion to dismiss into one for summary judgment, perhaps because of its reliance on Melkumyan's statement in his administrative Affidavit that "I do not believe that the Promotion Board engaged in discrimination against me based on my Armenian national origin." Mot. Dismiss at 14 (citing Pl's Aff., Ex. 1 of 1st Mot. Dismiss). Although courts routinely take judicial notice of EEO complaints and charging documents without converting motions to dismiss "[i]n the context of exhaustion," *see Sierra v. Hayden*, 254 F. Supp. 3d 230, 237 (D.D.C. 2017) (collecting cases), here the Government is asking the Court to consider a portion of the Report of Investigation for its evidentiary value with respect to discriminatory intent. The Court declines to do so. In any event, the proffered evidence is duplicative of Melkumyan's position in the Amended Complaint and briefing, making conversion unnecessary.

"To establish a prima facie case of discriminatory non-promotion, the plaintiff must show that: '(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone . . . filled the position or the position remained vacant and the employer continued to seek applicants.'" *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citation omitted).  In the typical case, the burden would then shift to the employer to articulate a legitimate, nondiscriminatory reason for the non-promotion, and then back to the employee to show pretext.  *Id.*  Unfortunately, the cases cited by both parties, which relate to whether and how discriminatory intent can be inferred in the *decisionmaker* under this burden-shifting format, are imprecise here because this is not the typical case.  Instead, Melkumyan advances the atypical theory that the earlier discrimination "tainted" the promotion decision even though the decisionmakers did not themselves directly discriminate on the basis of his national origin.  Opp'n at 19–20.  He urges the Court not to "permit this agency . . . to engage in illegal discrimination through one set of its employees, then 'cleanse' the agency of its illegal conduct by having another set of employees, who are themselves not discriminating, impose an 'adverse action' upon a plaintiff while relying upon (even unwittingly) the fruits of the earlier illegal discrimination."  *Id.* at 19.

Although the precedent cited by Melkumyan misses the mark, the theory he articulates corresponds to what is often referred to in the relevant jurisprudence as the "cat's paw" theory.[7]  In *Staub v. Proctor Hospital*, the Supreme Court addressed a situation in which the plaintiff's supervisors issued a baseless disciplinary reprimand out of a discriminatory animus that was then relied on by the decisionmaker who ultimately terminated him.  562 U.S. 411, 414–15 (2011).

---

[7] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 416 (2011).

*Staub* dealt with the Uniformed Services Employment and Reemployment Rights Act (USERRA), which prohibits employment discrimination on the basis of military obligations in similar language to Title VII. *See id.* at 416–17 (comparing the language of 38 U.S.C. § 4311(c) to the language of 42 U.S.C. § 2000e-2(a), (m)). The Supreme Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 422 (footnotes omitted).

The cat's-paw theory has been applied in other employment discrimination contexts as well. *See Morris v. McCarthy*, 825 F.3d 658, 668–69 (D.C. Cir. 2016) (discriminatory suspension under Title VII); *Heller v. Elkins*, 340 F. Supp. 3d 18, 31–32 (D.D.C. 2018) (retaliation claim under Title VII); *Duncan v. Johnson*, 213 F. Supp. 3d 161, 191 (D.D.C. 2016) (same); *see also Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015) (noting the potentially overlooked application of the cat's paw theory in a Title VII discrimination case). To prevail on a cat's-paw theory of discrimination, the employee should show that "[1] [the] supervisor performs an act motivated by [discriminatory] animus [2] that is *intended* by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action." *Morris*, 825 F.3d at 668 (quoting *Staub*, 562 U.S. at 422). Similarly, this Circuit has long held that "Title VII is violated when an employing organization uses discriminatory evaluations of an employee which were prepared by its own supervisory personnel, unless its procedures have given the employee a reasonable opportunity to inspect and correct these evaluations." *Stoller v. Marsh*, 682 F.2d 971, 976 (D.C. Cir. 1982); *see also Johnson v. Gen. Elec.*, 840 F.2d 132, 135 (1st Cir. 1988) (favorably citing *Stoller* in support of the determination that "the application of a discriminatory system to a particular substantive

decision (e.g., to promote, demote, fire, or award benefits) constitutes an independent discriminatory act which can trigger the commencement of the statute of limitations"), *abrogated on other grounds by Clockedile v. New Hampshire Dep't of Corr.*, 245 F.3d 1 (1st Cir. 2001).

When drawing all inferences in Melkumyan's favor, the Court determines that there is enough factual matter in the Amended Complaint to survive the motion to dismiss phase under this theory. The Amended Complaint alleges in no uncertain terms a discriminatory motive for the restriction of Melkumyan's duties, satisfying the first element. *See* Am. Compl. ¶ 13; *cf. Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015) (considering the applicability of a cat's paw claim to a supervisor's investigation and report of a train accident but rejecting it because there was no evidence of discriminatory animus in the supervisor who prepared the report).

The second element is a closer call. It is unclear whether Meredith and the supervisors who enforced her decision intended to deprive Melkumyan of a promotion, both because the decision significantly predated his non-promotion and because his supervisors in fact recommended him for a promotion. *See* Am. Compl. ¶ 26. Still, Meredith's actions had the alleged effect of depriving Melkumyan the "building blocks" needed for a later promotion, and a factfinder could reasonably infer that she and the other supervisors understood that to be the practical impact of her decision at the time. *See Bryson v. Chicago State Univ.*, 96 F.3d 912, 917 (7th Cir. 1996) ("Depriving someone of the building blocks for such a promotion . . . is just as serious as depriving her of the job itself."); *see also Contreras v. Ridge*, 305 F. Supp. 2d 126, 133–34 (D.D.C. 2004) (determining that a plaintiff class had sufficiently exhausted claims related to discrimination in "career-enhancing opportunities" such as training, assignments, transfers, and awards because "[a]ny EEOC investigation of the denial of promotions claim

would necessarily involve investigation into the building blocks of promotion"). At this early stage of the litigation, the Court is willing to allow Melkumyan the opportunity to develop this argument further.

Finally, Melkumyan alleges that "he was denied promotion to FS-02 as a direct and proximate result of the national origin discrimination carried out by Defendant." Am. Compl. ¶ 25. That allegation, while admittedly conclusory, is plausible enough in light of the foregoing factual allegations. Causation is normally a question of fact for the jury. *Payne v. District of Columbia*, 741 F. Supp. 2d 196, 219 (D.D.C. 2010), *aff'd*, 722 F.3d 345 (D.C. Cir. 2013). And as Melkumyan points out, without discovery there is no way to know what information the Promotion Board considered in its ranking and whether the reduction of his duties had an impact on his ranking. Opp'n at 20. Accordingly, the Court will allow Melkumyan's claim for discriminatory non-promotion to go forward.

## V. CONCLUSION

For the foregoing reasons, Defendant's Second Motion to Dismiss (ECF No. 8) is **GRANTED IN PART AND DENIED IN PART** and Defendant's First Motion to Dismiss (ECF No. 5) is **DENIED AS MOOT**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 22, 2022                                        RUDOLPH CONTRERAS
                                                            United States District Judge