## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GAGIK MELKUMYAN,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-cv-02700** |
| **SAMANTHA POWER,** *Administrator, U.S. Agency for International Development,* | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

This case is an employment discrimination matter involving the United States Agency for International Development ("USAID"). Defendant Samantha Power is the Administrator of USAID. Am. Compl., ECF No. 7 at 1. Plaintiff Gagik Melkumyan has been an employee of USAID since 2010 and was, at all times relevant to the Amended Complaint, a Foreign Service Officer working out of the USAID Regional Office in Georgia as the Deputy Regional Controller and then Regional Controller for the USAID missions in Armenia, Georgia, and Azerbaijan (collectively, the "Caucasus region"). *Id.* Plaintiff alleges that in late 2017, shortly after arriving at his assignment in the Caucasus region, his job duties with respect to the Azerbaijan Mission were substantially reduced expressly because he is Armenian American and his surname is associated with a territory that is disputed between Armenia and Azerbaijan. Mem. Supp. Def.'s Mot. Summ. J., ECF No. 22-1 at 10–11; Melkumyan's Aff., ECF No. 22-5 at 3; Melkumyan's Dep. Tr., ECF No. 22-4 at 18–19. Plaintiff further alleges that this reduction in his duties weakened his promotion package, causing him to be passed over for promotion in the 2020 promotion cycle. Melkumyan's Aff., ECF No. 22-5 at 4–5.

Plaintiff filed his Complaint on October 14, 2021, ECF No. 1, and an Amended Complaint on January 17, 2022, ECF No. 7. The operative complaint contains a single count, which alleges USAID subjected Plaintiff to illegal discrimination on the basis of his national origin when Plaintiff's supervisors restricted his job duties related to Azerbaijan, an action which he alleges affected the terms or conditions of his employment and ultimately resulted in the denial of a promotion. ECF No. 7 at 5–6. In January 2022, Defendant filed a Motion to Dismiss. ECF No. 8. On July 22, 2022, Judge Contreras granted that motion in part and denied it in part. ECF No. 11. In his Memorandum Opinion, Judge Contreras found that, while any claim of national origin discrimination based on the alleged 2017 reduction of Plaintiff's job responsibilities related to the Azerbaijan Mission was untimely, Plaintiff had stated a claim as to discriminatory non-promotion in 2020 that was viable under the "cat's paw" theory of discrimination articulated by the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). ECF No. 12 at 5, 13–14. Thereafter, Plaintiff's non-promotion claim proceeded through discovery, during which time this case was referred to the undersigned for all purposes, with the consent of the parties. *See* ECF No. 16. On April 13, 2023, Defendant filed the instant Motion for Summary Judgment, and that motion has now been fully briefed. *See* ECF Nos. 22 through 24.

Upon review of the parties' briefing, and the entire record of the case,[1] the Court concludes that there remain genuine issues of disputed material fact and that Defendant is not entitled to

---

[1] The following filings are relevant to this Memorandum Opinion and were considered by the Court: (1) the Amended Complaint, ECF No. 7; (2) Judge Contreras' Memorandum Opinion on Defendant's Motion to Dismiss, ECF No 12; (3) Defendant's Motion for Summary Judgment, ECF No. 22, and attachments; (4) Plaintiff's Opposition to Defendant's Motion for Summary Judgment, ECF No. 23, and attachments; and (5) Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, ECF No. 24, and attachment. Citations herein to filings on the docket of this case reference the page numbers assigned to the document by the Court's electronic filing system rather than the original page numbers of the document, to the extent that those numbers are different.

judgment as a matter of law.  Therefore, the Court will deny Defendant's Motion for Summary Judgment.

## I.    FACTUAL BACKGROUND

### A.    The Alleged 2017 Reduction of Plaintiff's Duties as Regional Controller[2]

Plaintiff arrived at USAID's regional office in Tbilisi, Georgia, in September 2017 to begin a new assignment as a Deputy Regional Controller[3] in USAID's Office of Financial Management for the Caucasus region.  Def.'s Statement of Material Facts, ECF No. 22-2, ¶ 3.  In that role, Plaintiff "provided accounting and financial analysis, oversight, and reporting services for the region's three countries (or missions): Georgia, Armenia, and Azerbaijan."  *Id.*, ¶ 4.

On November 9, 2017, Plaintiff met with Mikaela Meredith to discuss USAID's Azerbaijan Mission.  *Id.*, ¶ 7.  At that point, Meredith was the Mission Director for the Azerbaijan Mission and had worked at USAID for 25 years.  *Id.*; Meredith's Aff., ECF No. 22-10 at 2.  Also present at the meeting was Robert Arellano, Regional Controller for the Caucasus region and Plaintiff's first-line supervisor.  Def.'s Statement of Material Facts, ECF No. 22-2, ¶ 7.  What happened during that meeting is in dispute.  USAID does not address that dispute in its motion for summary judgment, apparently because it believes that its resolution is relevant "only [to] the first prong of the cat's paw analysis set forth in *Staub*" and not "the second and third prong of the analysis" that is the subject of its motion.  Def.'s Reply, ECF No. 24 at 4.  Because the Court finds that who the jury chooses to believe concerning what happened during the November 2017 meeting may well

---

[2] Unless otherwise indicated, the facts in this section are undisputed and drawn from Defendant's Statement of Material Facts As to Which There Is No Genuine Issue, ECF No. 22-2, Plaintiff's Response to Defendant's Statement of Material Facts, ECF No. 23-1, and Defendant's Response to Plaintiff's Additional Statements of Fact, ECF No. 24-1.

[3] Plaintiff's job title is referred to in the record as either Deputy Regional Controller or Regional Deputy Controller. The Court will use the former title.

be relevant to the jury's determination of the second prong of the *Staub* analysis, *see infra* section III.B, the factual dispute will be detailed here.

For his part, Plaintiff asserts that his supervisor, Arellano, introduced him to Meredith during the meeting and "noted [Plaintiff] was of Armenian origin."  Melkumyan's Aff., ECF No. 22-5 at 3.  According to Plaintiff, Meredith then "stated that given the long-standing historical conflict between Armenia and Azerbaijan, [his Armenian] national origin would cause 'mental difficulties' for her staff and she would prefer that [he] not support her [Azerbaijan] Mission."  *Id.; see also* Melkumyan's Dep. Tr., ECF No. 23-2 at 17 (stating that Meredith asserted that "[b]ased on some discussions she's ha[d] with her staff, [Plaintiff's] coverage of the [Azerbaijan] mission will cause mental difficulties" and "she preferred that Robert [Arellano] cover[] her mission and not [Plaintiff]").  In response, Arellano, who is not of Armenian national origin, "agreed to cover the Azerbaijan Mission."  Melkumyan's Aff., ECF No. 22-5 at 3.  Meredith then "proceeded to high five Mr. Arellano in joy."  *Id.*; Arellano's Aff., ECF No. 22-7 at 3.  Thereafter, Plaintiff says he "was hindered in trying to perform [his] job duties as to Azerbaijan, which was one third of [his] assigned three missions."  Melkumyan's Aff., ECF No. 22-5 at 5.  In Plaintiff's telling, the Agency's reason for the diminution of duties was not pretextual, but was driven by Meredith's "explicit discrimination" against him based on his Armenian national origin.  *Id.* at 4–5, 10.

Arellano largely supports Plaintiff's version of events.[4]  Although he does not identify a particular date on which the meeting occurred, he does remember a conversation with Meredith

---

[4] Plaintiff has also produced an email—cited by USAID in support of its motion for summary judgment—that he sent to Arellano and another supervisor a month after the November 7 meeting wherein his recollection of what occurred during the meeting is consistent with his testimony.  *See* ECF No. 22-12 at 2 (stating that, during the meeting, Meredith "noted that there can be 'emotional difficulties' with [Plaintiff] supporting [the Azerbaijan Mission]" because of his "race/national origin" and that she "responded in a very joyful manner . . . by proceed[ing] to get up to high five [Arellano] as an affirmation of the decision to limit [Plaintiff's] interaction with [the Azerbaijan Mission]").

which tracks with Plaintiff's recollection.  *See* Arellano's Aff., ECF No. 22-7 at 4–5.  Arellano

states in his affidavit that:

> Soon after [Plaintiff] arrived on post, I had a conversation with [Meredith] and she
> advised me that she had talked to her staff in Azerbaijan, and they told her that they
> would be uncomfortable working with [Plaintiff] because he was Armenian.  She
> suggested that I handle the Azerbaijan Mission personally, and that [Plaintiff] be
> kept in the background and concentrate on the other two Missions in the Region.  I
> agreed to that at the time because I thought this would just be a temporary situation
> until we could get the matter straightened out. It persisted like that for the rest of
> my time in that position.[5]

*Id.* at 4–5.  And like Plaintiff, Arellano believes there was "no pretext" for the diminution in Plain-

tiff's duties; rather, he says, "Meredith's stated reason for requesting that [Plaintiff] not be seen to

be working on Azerbaijan issues was his national origin."  *Id.* at 6.

      Meredith's account contrasts sharply with both Plaintiff's and Arellano's.  While she ad-

mits that she knew Plaintiff was of "Armenian heritage," she asserts that she "never told anyone

that [Plaintiff's] nationality would cause mental difficulties for [her] staff," and that "to say [Plain-

tiff] was sidelined from participation as regards the Azerbaijan portfolio is not true."  Meredith's

Aff., ECF No. 22-10 at 3, 5.  Specifically with respect to her conversation with Arellano concern-

ing Plaintiff, she states:

> [S]oon after [Plaintiff] arrived in Georgia, Robert Arellano, then Regional Control-
> ler and [Plaintiff's] supervisor, told me that [Plaintiff] was Armenian, and asked
> me, considering the conflict between the two countries, if it would be a problem for
> [Plaintiff] to support the Azerbaijan portfolio.  I said I would talk to the staff, and I
> sent an email to the staff asking if anybody had any concerns about this, advising
> the staff that they could talk to me privately about it if they wanted to, but no one
> expressed any concerns either in response to my email or when it was discussed at
> a staff meeting, so I reported to Mr. Arellano that it would be fine for [Plaintiff] to
> support the Mission.  As far as I am concerned, [Plaintiff's] nationality never be-
> came an issue, and I never witnessed any discrimination against [Plaintiff] by the
> staff, so I am very surprised about this complaint.

---

[5] Arellano was the Regional Controller for the USAID Caucasus region for four years, "2015 through 2019."  ECF No. 22-7 at 2.

*Id.* at 3.  Meredith also denies that Plaintiff "was . . . taken off the Azerbaijan portfolio,"[6] or that any "requests were made to limit [his] involvement with the Azerbaijan portfolio in any way," and she is "completely stunned that [Plaintiff] says otherwise."  *Id.* at 5, 6.

It is undisputed that the Government of Azerbaijan repeatedly denied Plaintiff's travel visa applications in 2018, which prohibited him from traveling to Azerbaijan during the period in question.  Def.'s Statement of Material Facts, ECF No. 22-2, ¶¶ 12–13.  The extent to which the denial of Plaintiff's visa may have impacted his ability to do his job with respect to the Azerbaijan Mission is contested, however.  So, too, is whether Meredith, or other USAID representatives, did anything to rectify the visa situation or, indeed, effectively ratified Azerbaijan's visa denial.  For his part, Plaintiff submits some evidence that his travel visa was denied by Azerbaijan because of his national origin,[7] that the denial "severely limited [his] ability to complete [his] Controller responsibilities to [the Azerbaijan] Mission," and that "neither USAID nor the U.S. Embassy in Baku took any action that [he] could see to rectify the situation."  Melkumyan's Aff., ECF No. 22-5 at 8.  As to the latter, Plaintiff is especially critical of USAID's seeming refusal to bring pressure on Azerbaijan to grant his visa through Section 666 of the Foreign Assistance Act, which bars the U.S. from giving foreign assistance funds to a country that "objects to the presence of any officer or employee of the United States who is present in such country for the purpose of carrying out any program of economic development assistance authorized by the provisions of this chapter, on

---

[6] Meredith states that she has emails demonstrating that Plaintiff was "heavily involved in many important issues" related to the Azerbaijan Mission.  *Id.* at 5.

[7] Plaintiff asserts that the U.S. Embassy courier told him that, when the courier was waiting to pick up Plaintiff's paperwork concerning his rejected travel visa in April 2018, he overheard Azerbaijani consulate officials referring to Plaintiff as "'dushman,' which means enemy."  Melkumyan's Aff., ECF No. 22-5 at 8.  Plaintiff further says that this discriminatory intent was "verified by the [then] current USAID Azerbaijan Mission Director, Jaidev Singh, on December 9, 2019, when he noted to [Plaintiff] . . . that the reason [he had] not been able to receive [his] visa is due to the Armenian origins of [his] last name."  *Id.*

the basis of . . . national origin . . . of such officer or employee." 22 U.S.C. § 2426(b).  According to Plaintiff, despite Azerbaijan's repeated denial of his visa applications, the USAID Azerbaijan Mission "falsely attested" on the 2018 "statutorily required Section 666 checklist for Azerbaijan . . . that the Government of Azerbaijan ha[d] not discriminated by objecting to the presence of any officer or employee of the United States government on the basis of . . . national origin . . ., despite the way [he] was treated" which, according to Plaintiff, was "well known to the Mission in Azerbaijan."  Melkumyan's Aff., ECF No. 22-5 at 8–9.  Plaintiff asserts that "this false [Section 666] determination removed all [U.S. Government] leverage [over Azerbaijan's denials of his visa] and ratified Azerbaijan's discrimination against [him]."  *Id.* at 9.

Plaintiff's version of events is again supported by Arellano.  He states that "[o]ne large obstacle preventing [Plaintiff] from doing his job as to the Azerbaijan Mission was that the Azerbaijan government would not grant him a travel visa to travel to Azerbaijan" because "a significant part of the duties of the Controller's office involve[d] personally reviewing financial records and talking to people in person about them, and Plaintiff could not do that as he could not travel to Azerbaijan."  Arellano's Aff., ECF No. 22-7 at 5.  Arellano further asserts that USAID could have put pressure on Azerbaijan to issue Plaintiff's visa and "so far as [Arellano knew], it was not done."  *Id.* at 6.  That is, he "did not see that Ms. Meredith was doing very much to help [Plaintiff] obtain that visa."  *Id.* at 5.  With respect to the Section 666 certification, Arellano confirms that USAID "does submit a statutorily required checklist to certify to the State Department whether any government is discriminating against U.S. employees working on economic assistance," and that if USAID said in the certification that "Azerbaijan was no[t] discriminating against [Plaintiff] based on his national origin, [Arellano did] not believe that would have been true."  *Id.* at 6.

Meredith's version of events again stands in tension with that offered by Plaintiff and Arellano. She could "not say why the Azerbaijan government did what it did" with respect to Plaintiff's visa denials, and further asserts that her "office worked with the embassy staff and tried to get [Plaintiff] to Azerbaijan," that her "Acting Mission Director brought the issue up with the Embassy Front Office . . . and [that they] were working to get an official explanation from the Azerbaijan government as to what the issue was." ECF No. 22-10 at 7; *see also* Singh's Aff., ECF No. 22-6 at 5 (stating that "[t]o the extent [Plaintiff] believes [Meredith] had something to do with his inability to obtain a visa from the Azerbaijan government, I do not believe this is true. Many people at USAID . . . worked on trying to get him a visa . . . [but] the Azerbaijan security services considered him a security risk"). She denies being part of the Section 666 certification process but "did not see any discrimination." Meredith's Aff., ECF No. 22-10 at 7. In any event, she states that she "did not see that [Plaintiff's] inability to travel [to Azerbaijan] prevented him from carrying out his duties, and from what [she] saw, he did a very good job." *Id.* at 7. She adds that she "feel[s] sorry for [Plaintiff] . . . [but] did not see any discrimination holding him back in terms of his professional development when [she] was in Azerbaijan." *Id.* at 8.

### B.     Plaintiff's Non-promotion During the 2020 Promotion Cycle

As noted, Judge Contreras dismissed as untimely Plaintiff's claim of national origin discrimination based on the November 2017 reduction of his job duties. Mem. Op., ECF No. 12 at 5, 13–14. However, he allowed the claim as to Plaintiff's non-promotion during the 2020 promotion cycle to go forward on the theory that the allegedly discriminatory reduction of his duties in 2017 was the cause of his later non-promotion. *Id.* at 16; *see also* Def.'s Statement of Material Facts, ECF No. 22-2, ¶¶ 19–21; Pl.'s Resp. to Def.'s Statement of Material Facts, ECF No. 23-1, ¶¶ 19–21; Melkumyan's Aff., ECF No. 22-5 at 4–5. According to Plaintiff, the reduction in his job duties "hindered" him from "perform[ing] [his] job duties as to Azerbaijan, which was one

third of [his] assigned three missions," which weakened his 2020 promotion package sufficiently to cause his non-promotion.  Melkumyan's Aff., ECF No. 22-5 at 4–5.  Notably, Plaintiff says the discriminatory reduction of his duties endured past 2017 and stretched over the approximately two-and-a-half years prior to him applying for a promotion in 2020.  *See* Melkumyan's Dep. Tr., ECF No. 23-2 at 20, 40 (stating that the discriminatory reduction in job duties continued "during the whole time [Arellano] was" Regional Controller for the Caucasus region through 2019; Arellano "clearly followed [Meredith's] orders to limit my responsibilities based on national origins"), 7, 39, 44–45 (stating that "[n]othing changed" with respect to Plaintiff's diminished job duties when Meredith left as Azerbaijani Mission Director in July 2018; rather, Jaidev Singh "continu[ed] . . . [Meredith's] posture . . . [H]e basically just went along with the discrimination . . . ."; Singh served as Mission Director for the rest of the time Plaintiff was assigned to the Caucasus region through 2021); Melkumyan's Aff., ECF No. 22-5 at 9 (stating that "there really was no change" when Meredith left the position of Mission Director and was "replaced by Mr. Singh").  There is a factual dispute on that point as well—Meredith claims that she never caused any reduction in Plaintiff's duties, *see* Meredith's Aff., ECF No. 22-10 at 3, 5–7, and Singh, who followed her, states there were "no issues with [Plaintiff's] ability to perform his duties related to Azerbaijan" once he became Mission Director in July 2018, *see* Singh's Aff., ECF No. 22-6 at 2, 6.  Nor does Defendant concede in its motion that any reduction in Plaintiff's duties that may have resulted had a substantial impact on his non-promotion in 2020.  ECF No. 22-1 at 24–25.  To understand those factual disputes in context, an understanding of the 2020 promotion process and of the contents of Plaintiff's promotion package is necessary.

### C.      2020 USAID Promotion Selection Process[8]

During the 2020 promotion cycle, employees eligible for promotion based on "time in grade and overseas time" were evaluated by the Foreign Service Promotion Board ("Promotion Board") based on six "promotion decision factors":  (1) Leadership; (2) Results and Impact Focused; (3) Professionalism; (4) Talent Management; (5) Understanding of and Ability to Advance the Agency's Mission; and (6) Difficulty, Complexity, and Challenge of the Work Performed. Lappin's Aff., ECF No. 22-11 at 3.  Three components made up the promotion package submitted by each candidate to the Promotion Board: (1) the Promotion Input Form (PIF), in which the candidate described how they exemplify the first four of the decision factors and provided examples of how they "advanced the Agency's mission"; (2) the candidate's current and previous four years of Annual Accomplishment Records (AARs), in which the candidate described five contributions or accomplishments for each year; and (3) the Multisource Ratings (MSRs), in which the candidate's supervisor, peers, and subordinates numerically rated the candidate's proficiency in the first four decision factors.  *Id.* at 3–4.

Each member of the Promotion Board—there were four in the 2020 promotion cycle—received each candidate's package and individually assigned the candidate a score for each of the six decision factors.  *Id.* at 4.  If any board member's score for a candidate differed from that of any other member by more than one point, the members were required to discuss the scores and bring the scores to within one point of each other.  *Id.*  The scores were then used to rank the

---

[8] The mechanics of the promotion process are described in the record in an affidavit from Martha Lappin, a USAID employee who led the design of the process that was used in 2020.  ECF No. 22-11 at 2.  Defendant submitted the affidavit in support of its motion for summary judgment.  ECF No. 22-3 at 1.  Neither party has disputed the statements in the affidavit describing the mechanics of the promotion process.

candidates for promotion from highest to lowest.[9]  *Id.*; *see* Promotion Bd. 2020 Rankings, ECF No. 22-15.  The Promotion Board also assigned each candidate a rating of A, B, or C, with only those rated "A" being eligible for promotion.[10]  Lappin's Aff., ECF No. 22-11 at 4.  Not all employees who were found eligible for promotion by the Promotion Board were promoted, however.  *Id.*  The actual number of individuals who were promoted was determined by the USAID Administrator based on the agency's budget and workforce plan for the year, and Promotion Board members were unaware of this number when they assigned ratings and scores.  *Id.*  In the 2020 promotion cycle, only the top 18-ranked, promotion eligible candidates were promoted.  *Id.* at 5.  Plaintiff—although he was graded promotion eligible—was ranked 22 out of 79 candidates, so he was not promoted.  *Id.*

### D.    Plaintiff's Promotion Package

The facts in this section are drawn from Plaintiff's promotion package which Defendant submitted as an exhibit to its motion for summary judgment.[11]  Melkumyan's 2020 Promotion Package, ECF No. 22-14.  The promotion package includes information, achievements, and

---

[9] The record contains no information as to how the scores given by each member on each of the six decision factors were combined to create the overall ranking of the candidates.

[10] The record contains no information as to how the Promotion Board determined the grade ratings.

[11] This set of documents includes some, but not all, of the documents described by Martha Lappin as comprising a promotion package (for example, the exhibit includes only two years of Annual Accomplishment Records instead of five), and also incudes some documents that Lappin did not describe as being part of the promotion package, including "Quarterly Conversation Record Details," an "Annual Performance Evaluation," an "Annual Evaluation Form," records related to awards for which Plaintiff was nominated and won, "Notification of Personnel Action" records, an "Operating Unit Context Statement," and a training transcript.  *See* Melkumyan's 2020 Promotion Package, ECF No. 22-14. This discrepancy may be related to a transition to a new promotion process during the relevant time period.  *See* Lappin's Aff., ECF No. 22-11 at 3 (describing the "old promotions process," which "relied heavily on the Annual Evaluation Forms," and then the "new process," the latter of which was the focus of Lappin's response).  In any event, Defendant submitted these documents in support of its motion for summary judgment, and denoted them, without objection, as Plaintiff's "promotion package."  *See* Def.'s Mot. for Summ. J., ECF No. 22-1 at 24; Def.'s Index of Exs., ECF No. 22-3; Melkumyan's 2020 Promotion Package, ECF No. 22-14.

evaluations dating from the entire period relevant to this case, i.e., from 2017 through 2020.  *Id.* at 9–10, 17–24, 31–34, 35–40, 41–45.

       1.       Promotion Input Form (PIF)

On the PIF, for the "Leadership" factor, Plaintiff described his work in USAID's Georgia Mission, focusing on how he "developed an innovative local partner base diversification approach" and "built consensus on the execution of this new approach."  Melkumyan's 2020 Promotion Package, ECF No. 22-14 at 8.  Plaintiff did not mention any work in Armenia or Azerbaijan in this response.  *Id.*

For the "Results and Impact Focused" factor, Plaintiff described his assessment of internal controls in "all three client Missions" (*i.e.*, Georgia, Armenia, and Azerbaijan) and development of new memoranda of understanding with those missions, "new Mission Orders, regional training, and a new on-line based tracking and reporting system."  *Id.* at 9.  The bottom of the section provides space for the candidate to list two "example" locations.  *See id.*  Plaintiff listed Georgia and Armenia, not Azerbaijan.  *Id.*

For the "Professionalism" factor, Plaintiff described how he "identified Supreme Audit Institutions (SAIs) as local accountability institutions that were critical to good governance across all development sectors," explicitly highlighting the work of his teams in Armenia and Georgia.  *Id.*  As in the previous section, Plaintiff listed Armenia and Georgia in the two "example" slots.  *Id.*  This response does not mention Azerbaijan.  *See id.*

For the "Talent Management" factor, Plaintiff described how he developed and implemented an online audit firm screening tool both in Afghanistan (his assignment prior to his Caucasus region assignment) and in the Caucasus region (*i.e.*, Georgia, Armenia, and Azerbaijan).  *Id.* at 10.  Plaintiff listed only Afghanistan and Caucasus in the two "example" slots.  *Id.*

The PIF also has a section where the candidate describes their "Understanding of and Ability to Advance the Agency Mission." *Id.* at 10.  In that section, Plaintiff described how he negotiated a memorandum of understanding with the SAI in Armenia and collaborated with the U.S. Embassy in Armenia to develop a new proposal that was ultimately selected for funding and which will "strengthen the fragile democracy of the Armenian government." *Id.* at 10.  In the single location example slot, Plaintiff indicated Armenia. *Id.*  This response did not mention Georgia or Azerbaijan. *See id.*

Finally, the PIF contains a section for supervisor comments.  Deputy Mission Director David Hoffman completed this section, highlighting Plaintiff's "efforts to strengthen the office's internal management" by "conduct[ing] a functional assessment and . . . draft[ing] an action plan" that resulted in "increased productivity, customer satisfaction, and the effectiveness of the Controller as the CFO for all three Missions." *Id.* at 11.  Hoffman also highlighted Plaintiff's "launch of a full-spectrum initiative to partner with [Supreme Audit Institutions] in Armenia and Georgia," which included "forg[ing] a partnership with these host country government bodies" and "design[ing] a new program to build their capacity." *Id.*  Unlike for Armenia and Georgia, Hoffman did not highlight any specific accomplishments by Plaintiff related to Azerbaijan. *See id.*  Hoffman concluded that Plaintiff "is clearly prepared to perform at the next grade level." *Id.*

2.     Annual Accomplishment Records (AARs)[12]

In his 2018–2019 AAR, Plaintiff noted that he "provide[d] financial management services to Armenia, Georgia and Azerbaijan," a portfolio that comprised 129 U.S. and local staff "who administer an overall portfolio of 90 activities valued at $296 million," and that he "serve[d] as

---

[12] While Lappin stated in her affidavit that an employee seeking promotion must "submit the current and previous four year's [AARs]", ECF No. 22-11 at 3, Plaintiff's promotion package appears to only include AARs from two one-year periods, 2018–2019 and 2019–2020.  *See* ECF No. 22-14.

Deputy Office Chief of Regional Office of Financial Management managing regional staff of 15[,] . . . oversee[ing] the internal controls, risks, audits, payments, accounting, reporting and financial analysis for all three missions." *Id.* at 25. In the section for "Context and Challenges Impacting Employee's Work," Plaintiff noted the rejection of his visa by the Government of Azerbaijan, which prevented him from visiting the Mission there, increasing his challenges in establishing proper controller oversight over the mission. *Id.* In the section titled "Significant Contributions and Accomplishments," Plaintiff included the maximum of five entries: (1) his development and implementation of "an online based audit firm screening, audit management systems, Mission Order and Standard Operating Procedures," tools which "were later adopted by multiple Missions and institutionalized agency wide"; (2) his design of "capacity building activities" for Supreme Audit Institutions, which "play [a] critical role [in] ensuring accountability of [U.S. Government] funds and sustainability of . . . [government-to-government] activities with partner Governments of Armenia and Georgia"; (3) his development of a "new methodology to assess the capacity of . . . local sub-recipients to diversify [the Georgia] Mission's local partner[] base"; (4) his direct work with the Government of Georgia, leading the country's "first Public Financial Management Risk Assessment Framework Stage 2 Risk Assessment . . . with internal resources, saving the Mission over $100,000," for which he received a Meritorious Honor Award; and (5) his design and execution of "the first Controller's assessment" of the Regional Controller's "alignment with client Mission Objectives and strategy for new initiatives," a project which "significantly improved . . . operations and increased [the] Mission's capacity to manage new activities." *Id.* at 26. Plaintiff did not highlight any specific Azerbaijan Mission accomplishments. *See id.*

In his 2019–2020 AAR, Plaintiff explained his role as "Regional Controller and Office of Financial Management (ROFM) Director," managing "all financial systems, practices, and

procedures" for the USAID Missions in Armenia, Georgia, and Azerbaijan.  *Id.* at 98.  In the "Context and Challenges" section, Plaintiff stated that to overcome the challenge of Azerbaijan's denial of his travel visa he "developed the systems and standard operating procedures . . . to provide ROFM services remotely, which later received [an] over 90% satisfaction rate from USAID/Azerbaijan staff and laid the foundation for unprecedented 100% telework due to COVID-19."  *Id.*  For his five "significant contributions and accomplishments," Plaintiff described how he (1) "strengthened the Missions' internal controls over operations" by "negotiat[ing] with client Missions' management" to redesign the "regional reporting structure, organizational chart, and . . . decades old ROFM Mission Orders, improving Mission critical oversight and guidance"; (2) "obtained, trained, and implemented remote access systems for [his] accounting and payments staff," allowing the regional office to "transition[] to unprecedented 100% telework in two days without interruption to . . . accounting and/or payments"; (3) "negotiated with [the Government Accountability Office] and [Supreme Audit Institutions] to develop scopes of work for an inter-agency agreement with [the Government Accountability Office] to support Georgian and Armenian [Supreme Audit Institutions]; (4) "developed and delivered a flagship . . . training with 33 different Mission participa[nts]," a training which was "officially adopted . . . Agency-wide"; and 5) "developed a new methodology" to "assess the capacity of current and potential local partners" and used it to "assess[] 19 partners' capabilities."  *Id.* at 99.  Again, Plaintiff did not highlight any specific Azerbaijan Mission accomplishments.  *See id.*

### E.    Plaintiff's Promotion Board Ranking for the 2020 Promotion Cycle

As noted, in the 2020 promotion cycle, only the top 18-ranked candidates were promoted. Lappin's Aff., ECF No. 22-11 at 5.  The Promotion Board gave Plaintiff a grade of "A" (meaning he was eligible for promotion) and a score of 3.69, which placed him at rank 22 of 79

15

candidates[13]—although, because he received the same score as candidates 20 and 21, only one candidate who scored higher than him (candidate 19) was not promoted. *See* Promotion Bd. 2020 Rankings, ECF No. 22-15. Candidate 18, the lowest-scoring candidate to be promoted, received a score of 3.73, effectively making this score the "cutoff point" for promotion. *Id.* Plaintiff's score of 3.69 placed him below the cutoff point, then, by 0.04—or about 1.1% of his score.

## II.      LEGAL STANDARDS

### A.      Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In order to establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While

---

[13] The top-ranked candidate received a score of 4.23, and the bottom-ranked candidate—candidate number 79—received a score of 1.92. *Id.*

the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson,* 477 U.S. at 252.  Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleading' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute).  Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party.  *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).  Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine dispute for trial." *Id.*  Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash.*

*Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  Nonetheless, a plaintiff is still obligated to support his or her allegations by competent evidence.  *Id.*  Accordingly, a plaintiff may not avoid summary judgment through "conclusory allegations and speculation."  *Id.*

### B.    "Cat's Paw" Discrimination Under Title VII

Following Judge Contreras' order on Defendant's Motion to Dismiss, the only remaining viable theory in this case is one of "cat's paw" discrimination, which the Supreme Court recognized in *Staub*, 562 U.S. 411.  That case arose in the context of a claim under the Uniformed Services Employment and Reemployment Rights Act of 1994, but the D.C. Circuit has acknowledged its applicability in the Title VII context.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 & n.1 (D.C. Cir. 2015).  "Under a cat's-paw theory of discrimination, an employer may be held liable for discriminatory acts by a direct supervisor—even where that supervisor is not the final decisionmaker—if '[1] [the] supervisor performs an act motivated by [discriminatory] animus [2] that is intended by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action.'"  *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (alterations in original) (emphasis omitted) (quoting *Staub*, 562 U.S. at 422).

### III.    DISCUSSION

In his Memorandum Opinion granting in part and denying in part Defendant's Motion to Dismiss, Judge Contreras ruled that Plaintiff's discriminatory non-promotion claim was the only theory to survive the Motion to Dismiss, and that it was viable only under the "cat's paw" theory of discrimination.  *See* ECF No. 12 at 5, 12, 16.  At summary judgment, the question for the court analyzing a "cat's paw" theory of liability under Title VII is whether "a reasonable jury could find that the plaintiff has met the three prongs of cat's-[p]aw liability that the Supreme Court articulated in *Staub v. Proctor Hospital*."  *Brandli v. Micrus Endovascular Corp.*, 209 F. Supp. 3d 356, 362

n.4 (D.D.C. 2016), *aff'd*, 709 F. App'x 7 (D.C. Cir. 2017) (per curiam); *see* Mem. Supp. Def.'s Mot. Summ. J., ECF No. 22-1 at 18–19. As discussed below, the Court concludes that a reasonable jury could find that Plaintiff has met the three prongs of the *Staub* test.

### A.   Did Meredith Perform an Act Motivated by Discriminatory Animus?

The first prong of the *Staub* test asks whether a supervisor has performed an act that is motivated by discriminatory animus. *Morris*, 825 F.3d at 668. Here, Plaintiff alleges that the first element of the *Staub* test is met because Meredith caused his job duties to be reduced in November 2017 expressly because of his Armenian national origin. Am. Compl., ECF No. 7, ¶ 8; Pl.'s Opp'n, ECF No. 23 at 5. To be precise, Plaintiff claims that Arellano—Plaintiff's supervisor—"fol-low[ed] [Meredith's] orders" to restrict his duties with respect to the Azerbaijan Mission because of his national origin. Melkumyan's Dep. Tr., ECF No. 23-2 at 57. Defendant does not contest the point in its motion for summary judgment, focusing instead on the second and third *Staub* factors. *See* Def.'s Reply, ECF No. 24 at 4 (stating that the "first prong of the cat's paw analysis set forth in *Staub* . . . is not at issue in Defendant's motion because Plaintiff has undisputedly failed the second and third prongs of the analysis").

The Court concludes that there is sufficient evidence in the record for a reasonable jury to find in Plaintiff's favor on this issue, thereby satisfying the first *Staub* prong. Plaintiff's allegations are supported not only by his own statements, but also those of Arellano, who claims personal knowledge of what Meredith did and why she did it. *See* Melkumyan's Dep. Tr., ECF No. 23-2 at 17 (stating that Meredith asserted that "[b]ased on some discussions she's ha[d] with her staff, [Plaintiff's] coverage of the [Azerbaijan] mission will cause mental difficulties" and "she preferred that Robert [Arellano] covers her mission and not [Plaintiff]"); Melkumyan's Aff., ECF No. 22-5 at 7–8 (making the same allegation); Arellano's Aff., ECF No. 22-7 at 4–5 (stating that Meredith suggested "that [Plaintiff] be kept in the background [on Azerbaijan] and concentrate on the other

two Missions in the region"), 6 (stating that "there was no pretext" for the reduction in Plaintiff's duties because "Meredith's stated reason for requesting that [Plaintiff] not be seen to be working on Azerbaijan issues was his national origin").  There is, of course, a sharp factual dispute between what Plaintiff and Arellano say occurred, and Meredith's version of events, wherein she denies that she ever discriminated against him on the basis of his national origin, or that she did anything to limit Plaintiff's duties with respect to the Azerbaijan Mission.  *See* Meredith's Aff., ECF No. 22-10 at 3 (stating that Plaintiff's "nationality never became an issue, and I never witnessed any discrimination against [Plaintiff] by the staff, so I am very surprised about this complaint"), 5 (stating she was "completely surprised" at the claim that she asked that Plaintiff not support the Azerbaijan Mission, that she "never told anyone that [Plaintiff's] nationality would cause mental difficulties for my staff," and that Plaintiff was neither "taken off the Azerbaijan portfolio" nor "sidelined from participation").  As Defendant's motion implicitly recognizes, determining which version of events is to be credited falls within the province of the jury and is inappropriate for summary judgment.  *See Barnett*, 715 F.3d at 358 ("Credibility determinations . . . are jury functions, not those of a judge at summary judgment.").

**B.  Did Meredith Intend to Cause Plaintiff to Suffer an Adverse Employment Action?**

The second prong of the *Staub* test asks whether the discriminatory act performed by the supervisor was intended to cause an adverse employment action.  *Morris*, 825 F.3d at 668.  As the *Staub* Court made clear, a plaintiff does not establish liability merely by asserting that the supervisor was reckless or negligent in causing the subsequent adverse employment action. *See Staub,* 562 U.S. at 417 ("Intentional torts such as this, 'as distinguished from negligent or reckless torts[,] . . . generally require that the actor intend "the consequences of an act," not simply "the act itself."'" (alterations in original) (emphasis omitted) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57,

61–62 (2011))).  "Under traditional tort law" principles, "intent" in this context "denotes[s] that the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Staub*, 562 U.S. at 422 & n.3 (quoting *Restatement (Second) of Torts*, § 8A (1965)).

To satisfy that prong, Plaintiff argues that when Meredith directed that his Azerbaijan Mission duties be reduced because of his Armenian origin, she "intended to hamper Plaintiff's promotion prospects in the future," or "knew . . . that the plausible outcome of her decision . . . could result in him not being promoted at a later date."[14]  *See* Pl.'s Opp'n, ECF No. 23 at 7–8.  When denying Defendant's Motion to Dismiss, Judge Contreras found, consistent with the legal standard above, that "Meredith's actions had the alleged effect of depriving Melkumyan the 'building blocks' needed for a later promotion, and a factfinder could reasonably infer [from the facts alleged in the Amended Complaint] that she and the other supervisors understood that to be the practical impact of her decision at the time," thereby satisfying the second *Staub* prong.  Mem. Op., ECF No. 12 at 15.

Although the Court believes this *Staub* prong remains "a closer call" than the first, *id.* at 15, it finds that there is sufficient evidence in the record for a reasonable jury to conclude that Meredith intended to cause Plaintiff's non-promotion when she allegedly caused the reduction in his job duties, or that she believed his future non-promotion was "substantially certain to result

---

[14] Plaintiff seems to suggest an alternative argument in his opposition—that he could satisfy the second *Staub* prong merely by establishing Meredith's intent to cause the intermediate adverse employment action (i.e., here, the reduction of his job duties) without any showing that she intended the ultimate employment action at issue (i.e., his future non-promotion).  *See* Pl.'s Opp'n, ECF No. 23 at 7 ("The cat's paw theory does not specify that Plaintiff prove that Meredith's actions cause the specific adverse employment action . . . , merely that it was intended to cause '*an* adverse employment action.'" (emphasis added)).  Plaintiff mentions that theory only in passing and cites no authority to support it.  *See id.*  "In this circuit, '[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Davis v. Pension Ben. Guar. Corp.*, 734 F.3d 1161, 1166–67 (D.C. Cir. 2013) (alteration in original) (quoting *Consol. Edison Co. of N.Y. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007)).  Thus, the Court finds that Plaintiff has forfeited the argument.

from it." *Staub*, 562 U.S. at 422 & n.3 (quoting *Restatement (Second) of Torts*, § 8A (1965)). There is enough evidence for Plaintiff to prove at trial each of the material factual allegations he made in the Amended Complaint, which Judge Contreras found sufficient to state a claim: that at a meeting with Meredith and Arellano in November 2017, Plaintiff was prohibited from carrying out certain Regional Controller duties with respect to the Azerbaijan Mission expressly because he was of Armenian origin, Melkumyan's Aff., ECF No. 22-5 at 7-8, 10; that the resulting reduction in his job duties encompassed one third of his job and involved critical responsibilities with respect to financial management and fiduciary oversight of taxpayer-funded programs in Azerbaijan, *id.* at 8; *see also* Melkumyan's Dep. Tr., ECF No. 23-2 at 26–27; that the reduction in duties stretched across multiple supervisors and lasted from November 2017 through the 2020 promotion selection cycle, Melkumyan's Aff., ECF No. 22-5 at 9; Melkumyan's Dep. Tr., ECF No. 23-2 at 7, 20, 39–40, 44-45; that upper-level USAID management did not assist him with obtaining a visa to travel to Azerbaijan to perform his essential job functions, after Azerbaijan denied him a travel visa, Melkumyan's Aff., ECF No. 22-5 at 8–9; and that Plaintiff was denied a promotion during the 2020 promotion cycle, *id.* at 3–4.

To be clear, most of those facts are disputed, *see supra* Sections I.A & I.B, and a reasonable jury could assess the record and the relative strength of the parties' evidence, resolve those disputes in Defendant's favor, and find against Plaintiff. But a reasonable jury could also credit Plaintiff's evidence over Defendant's and find it sufficient to prove the second *Staub* factor. That is, a reasonable jury could find that Meredith knowingly deprived Plaintiff of the essential functions of one third of his job in November 2017, and reasonably infer that she understood, having herself risen through the ranks in her 25 years at USAID, that doing so would deny him the "building blocks" he needed for promotion, to use Judge Contreras's words. *See* Mem. Op., ECF No. 12 at

15; Meredith's Aff., ECF No. 22-10 at 2; *Bryson v. Chicago State Univ.*, 96 F.3d 912, 917 (7th Cir. 1996) ("Depriving someone of the building blocks for such a promotion . . . is just as serious as depriving her of the job itself.").  Stated another way, a reasonable jury could infer from those facts that Meredith believed that Plaintiff's future non-promotion was substantially certain to result from her causing him to lose a third of his job duties in November 2017.

Seeking to avoid that result, Defendant highlights Plaintiff's deposition testimony stating his view that Meredith did not possess such an intent.  Mem. Supp. Def.'s Mot. Summ. J., ECF No. 22-1 at 20.  Specifically, when Plaintiff was asked whether he "believe[d] that  . . . Meredith intended to hurt [his] future chances of promotion" when she allegedly told Arellano in November 2017 that she did not want Plaintiff working on "Azerbaijani issues," Plaintiff stated, "I don't think she took that into consideration, no."  Melkumyan's Dep. Tr., ECF No. 23-2 at 19.  According to Defendant, "Plaintiff's concession[] end[s] the inquiry" as to the second *Staub* prong.  Mem. Supp. Def.'s Mot. Summ. J., ECF No. 22-1 at 23.  The Court disagrees.  The critical inquiry is not what Plaintiff believes Meredith thought, but what Meredith actually understood and intended at the time.  On that issue, Plaintiff is not the best witness; as he also testified, he "can't speak to her state of mind."  Melkumyan's Dep. Tr., ECF No. 23-2 at 19.  Just as a Title VII plaintiff's bare bones subjective belief that a supervisor bore a discriminatory intent is "wholly insufficient to establish an inference of discrimination," so too is Plaintiff's unadorned belief concerning Meredith's intent.  *Glass v. Lahood*, 786 F. Supp. 2d 189, 218 (D.D.C. 2011).  If confronted by his deposition "concession" at trial, a reasonable jury could be expected to understand that and not accord Plaintiff the status of mind reader.  Indeed, in assessing Plaintiff's credibility, a reasonable jury may find him more trustworthy precisely because such statements show him to be a measured witness, even to a fault.

Also misplaced is Defendant's reliance on the alleged intent of supervisors other than Meredith who Defendant asserts "wholeheartedly supported Plaintiff's application for promotion." Mem. Supp. Def.'s Mot. Summ. J., ECF No. 22-1 at 21–23.  What matters for Plaintiff's theory under the second *Staub* factor is what Meredith thought—what her intent was with respect to his future promotion potential when she allegedly caused the reduction in his job duties on the basis of his national origin.[15]  *See* Pl.'s Opp'n, ECF No. 23 at 7–8 (arguing as to the second *Staub* factor that "*Meredith* intended to hamper [his] promotion prospects in the future," or "*Meredith* knew she was acting in a discriminatory manner and that the plausible outcome of her decision to restrict [his] job duties solely on the basis of his national origin could result in him not being promoted at a later date." (emphasis added)).  On that score, Meredith may turn out to be the best witness—or the worst—depending on one's perspective.  There is a sharp disagreement in the record between what she says occurred in November 2017 and what Plaintiff and Arellano say happened.  While Meredith admits that she knew Plaintiff was of "Armenian heritage," she denies his other material allegations.  That is, she denies (1) that her Azerbaijan Mission staff had any "concerns" with him because of his national origin or that she ever "told anyone that [his] nationality would cause mental difficulties for [her] staff," Meredith's Aff., ECF No. 22-10 at 3, 5; (2) that she "sidelined [him] from participation [in] the Azerbaijan portfolio" or that any "requests were made to limit [his] involvement with the Azerbaijan portfolio in anyway," *id.* at 3, 5; and (3) that his "inability to travel [to Azerbaijan because of the denial of his visa] prevented him from carrying out his duties," *id.* at 7.[16]  Rather, Meredith states that she "reported to Mr. Arellano that it would be fine for

---

[15] Notably, while it is true that some of Plaintiff's supervisors supported his promotion, there is no evidence that Meredith did so.  *See* Meredith's Aff., ECF No. 22-10 at 3 (stating that she "had no involvement" in Plaintiff's 2020 promotion process and had "no interaction with [him] after June 2018").

[16] There also appears to be a factual dispute as to whether Meredith could have done more to encourage Azerbaijan to issue Plaintiff a travel visa, in part by using Section 666 of the Foreign Assistance Act, which bars the U.S. from giving foreign assistance funds to a country that "objects to the presence of any officer or employee of the United

[Plaintiff] to support the [Azerbaijan] Mission," and "[a]s far as [she was] concerned, [his] nationality never became an issue, [she] never witnessed any discrimination against [him] by the staff," and she is "completely stunned that [he] would say otherwise." *Id.* at 5, 6.

If the jury finds Meredith's testimony credible, no doubt Plaintiff will lose at trial. On the other hand, a rational jury could credit Plaintiff's version of events and conclude that Meredith is being untruthful. As a result, if she denies at trial that she had no intent to harm his future promotion potential (or would not understand that his non-promotion was substantially certain to result from reducing his job duties by a third)—as she likely will, given her statements to date[17]—the jury may choose to disbelieve her denial of that critical issue as well, thereby substantially assisting Plaintiff in meeting his burden with respect to the second *Staub* factor. *See Aka v. Wash. Hosp. Ctr.,* 156 F.3d at 1293 ("[A] a lie is evidence of consciousness of guilt. The jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory intent.").

When viewed through that lens—that is, the lens of a jury skeptical of Meredith's testimony—Plaintiff's assertion that she "high-fived" Arellano during the November 2017 meeting

---

States who is present in such country for the purpose of carrying out any program of economic development assistance authorized by the provisions of this chapter, on the basis of . . . national origin . . . of such officer or employee." 22 U.S.C. § 2426(b); *compare* Melkumyan's Aff., ECF No. 22-5 at 8 (stating that "neither USAID nor the U.S. Embassy in Baku took any action that I could see to rectify the situation" of the visa denial) *and* Arellano's Aff., ECF No. 22-7 at 6 (stating that USAID could have put pressure on Azerbaijan to issue a visa to the Plaintiff and "so far as I know, it was not done") *with* Meredith's Aff., ECF No. 22-10 at 7 (stating that her "office worked with the embassy staff and tried to get [Plaintiff] to Azerbaijan," and that her "Acting Mission Director brought the issue up with the Embassy Front Office . . . and [they] were working to get an official explanation from the Azerbaijan government as to what the issue was") *and* Singh's Aff., ECF No. 22-6 at 5 (stating that "[t]o the extent [Plaintiff] believes [Meredith] had something to do with his inability to obtain a visa from the Azerbaijan government, I do not believe this is true. Many people at USAID . . . worked on trying to get him a visa . . . [but] the Azerbaijan security services considered him a security risk"). If Plaintiff's version of events is credited, that could be further evidence of Meredith's discriminatory intent.

[17] *See* Meredith's Aff., ECF No. 22-10 at 8 (stating that she "did not see any discrimination holding [Plaintiff] back in term of his professional development when [she] was in Azerbaijan").

immediately after causing Plaintiff's job duties to be substantially reduced takes on more force.  A rational jury that believes Plaintiff's version of events could determine that such a "celebration of taking away a substantial portion of [his] job duties" because of his Armenian heritage—to use Plaintiff's words—reflects poorly on Meredith and on her intent when she caused that reduction. Pl.'s Opp'n, ECF No. 23 at 3; *see also* Melkumyan's Dep. Tr., ECF No. 23-2 at 17 (stating that Meredith "jumped up with joy" after Arellano agreed to cover Plaintiff's Azerbaijan duties and high-fived Arellano "right in front of [him]").

In sum, considering the record "taken as a whole," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and drawing "all justifiable inferences" in Plaintiff's favor as it must at this stage, *Anderson*, 477 U.S. at 255, the Court concludes that there is sufficient evidence for a reasonable jury to conclude that Meredith intended Plaintiff's future non-promotion—that is, that she either desired it or was substantially certain that the reduction in his job duties would cause that result.

### C.    Was the Reduction of Plaintiff's Duties a Proximate Cause of his Non-Promotion?

The final prong of the *Staub* analysis asks whether the allegedly discriminatory act "is a proximate cause of the ultimate employment action." *Morris*, 825 F.3d at 668 (quoting *Staub*, 562 U.S. at 422).  Under the traditional tort doctrine of proximate cause, an actor is liable for a harm only where the "actor's conduct is a substantial factor in bringing about harm to another," even if "the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred," as long as it was not "highly extraordinary that [the conduct] should have brought about the [ultimate] harm." *Restatement (Second) of Torts* § 435; *see Staub*, 562 U.S. at 419 n.2 (citing *Restatement (Second) of Torts* §§ 435, 435B and cmt. a).  That said, "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,'

and excludes only those 'link[s] that [are] too remote, purely contingent, or indirect.'" *Staub*, 562 U.S. at 419 (second and third alteration in original) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). "[G]enerally, the existence of proximate cause is 'a factual issue for the jury.'" *Cobb v. Wash. Metro. Area Transit Auth.*, No. 20-cv-3522, 2023 WL 3231443, at *5 (D.D.C. May 3, 2023). Indeed, "only in 'exceptional cases,'" where "'the evidence . . . will not support a rational finding of proximate cause' by any reasonable jury," may a court decide the question of proximate cause on a summary judgment motion. *Id.* (alteration in original) (first quoting *Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 275 (D.D.C. 2020), then quoting *District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C. 1984)).

Applying those principles, the Court finds that this is not the exceptional case where no reasonable jury could find in the plaintiff's favor on the issue of proximate cause. Plaintiff here has produced sufficient evidence to prove that the allegedly discriminatory reduction of his duties in November 2017 was a "substantial factor" in, or bore "some direct relation" to, his non-promotion in 2020 promotion cycle. Defendant objects to this conclusion, arguing that it is speculative as to whether the reduction of Plaintiff's duties in 2017 caused his non-promotion some two-and-a-half years later. Mem. Supp. Def.'s Mot. Summ. J., ECF No. 22-1 at 24. Defendant points to Plaintiff's own description of his non-promotion claim in his opposition brief—that, but for the discriminatory diminution of his duties in 2017, his "evaluations *could* have been stronger, which in turn *could* have resulted in [him] getting a higher ranking, which in turn *could* have led to a promotion" in 2020—as demonstrating that imagining such an "alternative universe" is "too remote . . . to establish proximate cause." *Id.* at 24, 26.

While a jury may reach that conclusion in this case and find for Defendant, the Court finds that a rational jury could also reach the opposite result and find for Plaintiff on the issue of

proximate cause.  As an initial matter, Defendant's suggestion that Plaintiff's non-promotion claim is too attenuated because "two-and-a-half years elapsed between the reduction of [his] duties and the Promotion Board's consideration of Plaintiff's application," rests on a disputed premise.  *Id.* at 25.  According to Plaintiff's version of events, the discriminatory reduction of his duties did not stop soon after it started in November 2017, leaving a long temporal gap prior to him seeking a promotion two-and-a-half years later.  Rather, Plaintiff says the reduction in duties endured and stretched over that entire period of time.  *See* Melkumyan's Dep. Tr., ECF No. 23-2 at 7, 20, 39, 44–45; Melkumyan's Aff., ECF No. 22-5 at 9.  While there is a factual dispute on that point— Meredith claims that she never caused any reduction in Plaintiff's duties, *see* Meredith's Aff., ECF No. 22-10 at 3, 5–7, and Singh states there were "no issues with [Plaintiff's] ability to perform his duties related to Azerbaijan" once Singh became Mission Director in July 2018, *see* Singh's Aff., ECF No. 22-6 at 2, 6—a reasonable jury could choose to believe Plaintiff's testimony about his own job and find that there was no temporal gap between the allegedly discriminatory reduction in his duties and the 2020 promotion cycle.

Further, the Court finds unpersuasive the suggestion that the ongoing diminution in Plaintiff's duties as Deputy Regional Controller, if believed, would be too insubstantial to support a reasonable jury's finding that it was "a proximate cause" of his non-promotion in 2020.  *Morris*, 825 F.3d at 668 (quoting *Staub*, 562 U.S. at 422).  As a general matter, the impediment to advancement that Plaintiff claims the discrimination created was not insignificant.  Plaintiff asserts that following the November 9, 2017 meeting, he was "left out of the information loop by the rest of the Azerbaijan Mission on critical Controller and Senior Management related issues, or dismissed and simply told to stand down when [he] made inquiries."  Melkumyan's Aff., ECF No. 22-5 at 8. He testified at his deposition that "since [he] was not allowed to work directly with" USAID's

partners in Azerbaijan, he "could not have any accomplishments that were worthy of a promotion that related to Azerbaijan." Melkumyan's Dep. Tr., ECF No. 23-2 at 27.[18]  Plaintiff says that, for Controllers like himself, "promotion-worthy accomplishments" consist of working directly with foreign counterparts (i.e., foreign auditors and accountants) to strengthen their financial management capacity and to provide financial oversight over U.S. taxpayer funds provided by USAID. *Id.* at 26–27.  According to Plaintiff, such "promotion-worthy accomplishments" could not be accomplished remotely, but "required [Controllers] to go there"—to go to the foreign country and to interact directly with USAID's foreign oversight partners. *Id.* at 61.  Plaintiff asserts that because of the discrimination he allegedly faced, he could not do so with respect to the Azerbaijan Mission, which effectively denied him promotion opportunities for "one third of [his] portfolio." *Id.* at 27.

Again, many of those facts are disputed.  But assuming that the jury finds Plaintiff credible, and taking all reasonable inferences in his favor as is required at this stage, the Court finds that a reasonable jury could determine that hobbling Plaintiff for two-and-a-half years from doing anything promotion worthy for one third of his job would be a "substantial factor" in, or at least bear "some direct relation" to, the non-promotion decision that evaluated his accomplishments during the period when he was so encumbered. *See Bryson,* 96 F.3d at 917 ("Depriving someone of the building blocks for such a promotion, if that is what a trier of fact thinks [the defendant] did, is just as serious as depriving her of the job itself.").

That conclusion, if reached by the jury, would find support in Plaintiff's 2020 promotion package.  In it, both Plaintiff and his evaluators make repeated reference to his accomplishments

---

[18] The Court would note that whether the Government of Azerbaijan's denial of Plaintiff's travel visa may be an independent cause of his inability to achieve "promotion worthy" accomplishments with respect to the Azerbaijan Mission—separate and apart from Meredith's alleged discriminatory acts—or whether the Defendant should be held responsible for Azerbaijan's decision because Meredith or other USAID representatives effectively ratified it through their action or inaction, are all disputed issues of fact. *See supra* Section I.A.  Because neither of those issues was raised by either party during summary judgment briefing, the Court will not address them further here.

with respect to the Missions in Georgia and Armenia.  The promotion materials are almost entirely

silent about any accomplishments he achieved specifically with respect to the Azerbaijan Mission.

*See generally* Melkumyan's 2020 Promotion Package, ECF No. 22-14.  For example, in the "Lead-

ership" section of his Promotion Input Form, Plaintiff highlighted his work in Georgia; Azerbaijan

is not mentioned.  *Id.* at 8.  In the "Understanding of and Ability to Advance the Agency Mission"

section, Plaintiff described his work in Armenia; again, Azerbaijan is not mentioned.  *Id.* at 10.  In

the "Professionalism" section, Plaintiff described his work in both Georgia and Armenia but not

in Azerbaijan.  *Id.* at 9.  In the "Results and Impact Focused" section, while Plaintiff described his

strengthening of internal controls in "all three client Missions," the bottom of the section provided

space for him to list two "example" locations.  *See id.*  Plaintiff listed Georgia and Armenia, not

Azerbaijan.  *Id.*  Similarly, in the "Rating Official Input" section, Plaintiff's supervisor highlighted

contributions that Plaintiff made to improve the Regional Office's financial operations and other

notable achievements in Armenia and Georgia.  *Id.* at 11.  Azerbaijan is not mentioned.  *Id.*  Fi-

nally, in the "Significant Contributions and Accomplishments" section of Plaintiff's 2018–2019

and 2019–2020 AARs, Plaintiff explicitly highlighted his achievements with the governments of

Armenia and Georgia.  *Id.* at 26, 99.  Again, Azerbaijan is not specifically mentioned.  *Id.*[19]

---

[19] The only specific reference to the Azerbaijan Mission involved—as Plaintiff testified in his deposition—his attempt
to turn the "challenge of being unable to travel to Azerbaijan into a strength."  Mem. Supp. Def.'s Mot. Summ. J.,
ECF No. 22-1 at 25 (quoting Melkumyan's Dep. Tr., ECF No. 23-2 at 59).  To "overcome this challenge," Plaintiff
stated in the 2019-2020 AAR that he:

> developed the systems and standard operating procedures . . . to provide [the Regional Office of
> Financial Management] services [to the Azerbaijan Mission] *remotely*, which later received over
> 90% satisfaction rate from USAID/Azerbaijan staff and laid the foundation for unprecedented 100%
> telework due to COVID-19.

ECF No. 22-14 at 29 (emphasis added).  The government—unwisely, in the Court's estimation—argues that because
Plaintiff "testified that he transformed his difficulties with Azerbaijan into a strength" he cannot demonstrate that the
restriction on his duties proximately caused his non-promotion, since those restrictions "helped his promotion pack-
age."  Def.'s Reply, ECF No. 24 at 13.  A reasonable jury may find distasteful the government trying to insulate itself

Thus, there were multiple opportunities in the promotion package for Plaintiff to showcase his accomplishments related to the Azerbaijan Mission—as he did repeatedly with respect to his work with the Missions in Georgia and Armenia—but he did not do so.  Plaintiff says the reason for the omission is simple: the alleged discrimination denied him any "promotion worthy" opportunities with respect to Azerbaijan.  Melkumyan's Dep. Tr., ECF No. 23-2 at 26–27, 62–63.  Defendant's questioning of Plaintiff during his deposition suggests its view of the omission is equally straightforward: Plaintiff's job duties were unencumbered by discrimination, and he simply did not do anything particularly "promotion worthy" with respect to Azerbaijan.  *See id.* at 48–63.  Assuming the jury believes Plaintiff's version of events and credits his undisputed success as a Regional Controller in Georgia and Armenia,[20] it could reasonably infer that he would have had similar success in the Azerbaijan Mission absent the discrimination, thus adding to his package's "promotion worthy" accomplishments.

Whether the addition of those achievements would have been enough to earn Plaintiff a promotion to FS-02 in the 2020 cycle is somewhat harder to discern.  Perhaps in another case, where the gap between the promoted and the non-promoted is larger, the case would not make it to the jury.  Here, however, where it is undisputed that Plaintiff was deemed "promotion eligible" by the Promotion Board and there is evidence that only a fractional difference separated him from

---

from liability by taking advantage of Plaintiff's attempt to make the best of the untenable position he says its alleged discriminatory conduct caused.

[20] Similarly, it does not necessary follow—as Defendant suggests—from the fact that Plaintiff received awards and "glowing performance appraisals and recommendations" from his other supervisors that any alleged discriminatory restriction on his duties could not have proximately caused his non-promotion.  Def.'s Reply, ECF No. 24 at 13; Mem. Supp. Def.'s Mot. Summ. J., ECF No. 22-1 at 21–22, 25.  Because Plaintiff did very well in his other assignments—which the government does not contest—it would be reasonable for a jury to infer that more of the same would have resulted had he not been allegedly denied the opportunity to do his job in Azerbaijan, thereby adding to his "promotion worthy" accomplishments.

those who were promoted, the Court believes that a reasonable jury could find that the absence of "promotion worthy" achievements in Azerbaijan was a "substantial factor" in, or at least bore "some direct relation" to, his non-promotion in 2020. Again, the Promotion Board gave Plaintiff an overall score of 3.69, which was only 0.04 below the 2020 promotion cutoff point of 3.73 for the 18 candidates who were promoted—a difference of just over 1%. *See* Promotion Bd. 2020 Rankings, ECF No. 22-15. Based on that record, the Court cannot say as a matter of law that it "'will not support a rational finding of proximate cause' by any reasonable jury." *Cobb*, 2023 WL 3231443, at *5 (quoting *Freeman*, 477 A.2d at 716).

For all these reasons, the Court concludes that a reasonable jury could find that Meredith's alleged discriminatory act—causing the reduction of Plaintiff's duties with respect to the Azerbaijan Mission—was a proximate cause of Plaintiff's non-promotion in 2020, satisfying the third *Staub* prong.

## IV.     CONCLUSION

Because the Court has found there are triable issues of fact as to each of the three *Staub* prongs, the Court concludes that there remain genuine issues of material fact in this case and that Defendant is not entitled to judgment as a matter of law. Therefore, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 22, is **DENIED**.

**SO ORDERED**.

Date: March 26, 2024

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE